Good morning, Mr. Carlin. You have three minutes for rebuttal, and you can begin whenever you are ready. Thank you. Good morning. May it please the court, my name is Stuart Carlin. I'm representing the appellant, Kim Brown. I believe that the district court below Ann erred in granting summary judgment because there was substantial record evidence that a reasonable jury could conclude that Ms. Brown was retaliated against in connection with the denial of her tenure at CUNY. I first want to address the issue of her extensive, and I mean very extensive, EEO activity. Let me just see if I can frame what your argument is, and you can correct me if I'm wrong, okay? I think your argument is it's undisputed that she did not comply with the settlement agreement. That's undisputed, right? She did not complete the coursework. Do you agree with that? Yes. So your argument is, because obviously that normally would be enough to deny her the tenure, but you're suggesting that the basis for denying her the tenure, which the failure to complete the programs, was due to scheduling conflicts. And in retaliation for her extensive EEO activity, as you put it, they intentionally created these conflicts in the scheduling so that she could not complete the programs she needed to get tenure. Isn't that your theory of the case? Yes, with one exception, which is the college-wide committee, knowing all the facts, knowing that she didn't complete the, you know, didn't get her doctorate or wouldn't get her doctorate in education, still went ahead and voted her, you know, very well qualified. So with that proviso, I would agree that she didn't comply with the settlement agreement. She was prevented from complying with the settlement agreement. All right. So a rational jury would have to find sufficient evidence to find that the retaliation was done through the scheduling conflict, correct? That is correct. All right. So this is the problem that I don't understand. The person who was responsible for the scheduling was Professor Robotham, right? That was the person. Well, the answer is we don't know because he's not alive. Well, we do know because there's e-mails back and forth between her and him. And she testified in her deposition that she was talking to him and that in several instances he pounded her. He said, okay, we'll fix that. We'll change your class. I can go back and, you know, it's 228, 234, 230. Your client was taking through these e-mails and I think admitted, oh, yeah, they made the change there, but it was too late. She had reasons why, even though they made the change, that it was still something she had to enroll in. Am I misunderstanding her testimony? Well, the record reflects that she had her scheduling conflict literally a week after she signed the settlement agreement. And the settlement agreement was caused by her grievance, which was in part caused by her prior complaints of discrimination. So she reached settlement agreement. She was represented by counsel. Then a week later she's given a schedule that conflicts so she cannot attend this one critical course at Columbia. She brings it to the attention of the labor designee, Ms. Isaacs. She's prevented. They refuse to change the schedule. She also has a more difficult schedule than other individuals. Let me give you some examples you can tell me from wrong, okay? In the spring 2017 semester, she didn't tell the school of her Columbia class schedule until after they gave her the teaching schedule. So they didn't know there was conflict, right? Isn't that accurate? Yes. So that's not their fault, right? She didn't tell them the class schedule. Yes, but she drew as soon as she got to schedule. And then they fixed it within three business days when they did find out. Okay. As soon as she got to schedule, before the semester started, she alerted them to the conflict, period. She also complained in an e-mail to the president of the college and to the provost in that springtime. She then met when she had the same problem. So I have two questions related to this. I mean, so can you explain her testimony that the person in charge of setting her schedule was her biggest ally? How do you square that circle? Well, typically the chairperson would set the schedule, period. However, you know, we don't have the benefit other than the practice of what normally happens at the college. That's all we have because that person is no longer there. Why is it after she brings it? Isn't the record as the closest comparator to how much somebody is going to get accommodated for these kind of schedule conflicts? I'm sorry, Your Honor? Do you have a comparator of somebody else who presented in a similar situation but did not, but received better treatment? I mean, she cites examples of people who have gotten better schedules, but not in this particular individual circumstance. It's a very unique circumstance, Your Honor. Okay. Something else, and this may be a failure of imagination on my part, and I apologize, but I am giving you the opportunity to correct it. I noticed that there was a lot of parts in your briefing about complaints that she made and about issues that she had. But can you point to me what you think, and I don't think they would actually dispute that she had a lot of complaints. I'm interested in hearing what facts do you think are materially in dispute that would change the summary judgment outcome? Like, not she had a complaint about X. Nobody's disputing that she had complaints, but what are the specific facts that, if we believe your client's version of the story, preclude summary judgment? Okay. Well, she had, putting aside the abundance of the protected activity that you're on, she had the scheduling issue in the spring, she had the scheduling issue after bringing it to their attention in the fall, and she had the scheduling issue the following year, three consecutive semesters. Nobody's disputing that she had no complaints. I'm sorry, Your Honor. Look, nobody is disputing that she had an objection to the scheduling, and yet the district court still found that there were no facts presented for which a jury could conclude in your client's favor. What is it about the scheduling issues that create a dispute effect? Okay. She had to take a required doctoral course at Columbia. She advised them specifically of the timeframe of when these courses were scheduled, were going to be scheduled. The bigger picture is the jury would have to find that her biggest ally, the person who was recommending her for tenure, who was dealing with these scheduling issues, somehow, there's not even an indication that he had knowledge of her protected activity, that somehow he was purposely not accommodating her scheduling requests to retaliate against her. How is that possible? Well, again, Your Honor, we don't have the benefit of his ‑‑ he's gone. I mean, we don't know. The benefit of the e-mails, the e-mails where he's talking to her about the scheduling conflicts, and she says, thanks for all your hard work, Professor Rothenbaum. We know he was the one dealing with her. And again, she testified her deposition. She didn't say, I wasn't dealing with him. I was dealing with somebody else. Who was the other person she was dealing with on her scheduling issues other than him? She was dealing with the dean, primarily with Dean Rowley. She had mentioned it to Dean Rowley. She had a number of conversations with the dean. There's one point I do want to make here also. She was talking to the dean, but the person who was responsible for working these out was the Professor Rothenbaum, right? You're saying the dean was the one who was making the schedule? No. I don't know, Your Honor. We don't know. What do you mean, you don't know? You haven't discovered. That's your job. I understand that. And I don't know what conversations the dean had or the provost had with the chief. I took their depositions. But at the end of the day, they were put on notice of the conflict, period, stop. And also, Your Honor, why not give her an extension? There's evidence in the record there was scheduling conflicts. That's not in dispute. Even Dean Rowley said that my client had come to her and had complained about her schedule, about her work, whether or not she was being treated differently, period. So why not grant her an extension? There were three semesters she had. It wasn't like one semester. There were three semesters, right? There were three semesters. Why couldn't they conclude that she just didn't want to do it? She just wasn't going to do it. In fact, she didn't even put the status letter on the date, right? Did she put the status letter on the date that she was required to under the settlement? I don't know, Your Honor. It was late. I don't have that in front of me. But, Your Honor, if I could just conclude, I mean, she put them on notice of the scheduling conflicts when not to schedule her. And they kept scheduling her. It was like, okay, they didn't know the first semester. They wouldn't change it even though they put her on notice. Then in the fall, same problem. She goes to the chair and says, you know, what's going on here? You know about this. And a scheduling conflict. Then again, it happens a third time. Each time they fixed it. And one time they even reassigned a course to another professor. And she still didn't go take the course at Columbia. That's because it was too late. Too late? It was within, like, two, three business days. She wouldn't have missed any classes. I don't understand. But there's a limited amount of space. Do you know how many students start their class late? They drop in there. There's a sign-on period. This is a very small program. This is a Ph.D. program, which is going to a doctoral, I don't know what they call it, but it has to do with her, I think, dissertation. And there's a limited amount of space. And she also testified that when they did change the schedule, it was too late. She couldn't enroll anymore because she got the notice and there was no space. And I just want to conclude that the two more points. Number one, that the State. Thirty seconds. Okay. That the State, that the college-wide gave her, knowing all that, gave her well-qualified and that no, no professor who got a recommendation three years previously had ever been denied tenure. So it was overridden. All right. Thank you.  Good morning. Radwazo? Yeah, Radwazo. Radwazo. Good morning, and may it please this Court. Anthony Radwazo on behalf of CUNY. First off, I'd like to discuss these extensive EEOC activities that counsel referred to. The only evidence that counsel provides for these extensive EEOC activities is her own declaration, which, as the District Court pointed out, simply parrots the conclusory and vague allegations in the complaint. Can you just explain to me why did she keep having Thursday night conflict? Yeah, there's a simple explanation for that in the record at pages 429 and 439. These are Ms. Brown's emails to Robatham, the department chair who was in charge of her schedule. You know, Medgar Evers College largely consists of nighttime and part-time students, people with responsibilities during the day and working hours. And she acknowledges in that email exchange with Dr. Robatham that no one is to blame for these scheduling issues because many classes are scheduled in the evening. Okay, but why Thursdays? Why did they keep happening on Thursdays? Thursdays, I don't know in particular. The record doesn't say. But I do want to clarify that, you know, counsel refers to many issues with her schedule over a period of time. There's actually evidence only of two conflicts here. That is, with the spring 2017 and the fall 2017 semesters, counsel has repeatedly stated there's a conflict in the spring 2018 semester. There's absolutely no record support for that in the summary judgment record. So what happened here is in January 2017, Ms. Brown received her schedule within three business days, as Judge Bianca pointed out. That was resolved. That was before the ad drop period at Columbia University. She chose not to attend her colloquium on Thursday evenings, nevertheless, despite that accommodation. Then in August 2017, she emailed Dr. Robatham directly about her schedule for the fall 2017 semester. He then accommodated. It was slightly longer. It was about a week later he made that accommodation. It was, again, before the semester started. And Brown herself acknowledged these accommodations at page 209 and 215 of the record in her deposition testimony. She acknowledged her Thursday evening conflicts were removed. So in connection with her particular degree, was there a particular class she had to take, or it was just you had to get everything done? The only thing in the record is this Thursday evening colloquium that she had to attend. She claimed she was attending it consistently. My understanding is she was supposed to attend it throughout the course of her graduate studies. But beyond that, the record is silent with respect to her requirements. Even accepting, as the district court here noted, with respect to these EEOC activities, there's actually only three sets of activities that are really at issue here. There's complaints made in January 2017, a complaint about bias in an academic faculty search in February 2017, and then a complaint. Was it really proper for the district court to resolve this on the prima facie case? And I wanted you to focus on temporal proximity. If, in fact, you can't consider the reasons the reporter is offering for the adverse actions at the prima facie case. So the district court did an analysis about how many months and whether an inference could be drawn. But there was complaints being made during this period, and there's only so many semesters. So there's a lot of case law that says even if it's more than three months or four months, if it's the next available opportunity for them to retaliate, you can draw an inference for temporal proximity, which alone is enough for you to get past the prima facie case. So wasn't that a little aggressive to say there's not a prima facie case, which is pretty minimal? There were multiple semesters, and there were complaints sort of sandwiched in between them? Right. So I wouldn't call it aggressive at all. I would say it's well in line with this court's precedence. It is true this court has not adopted any sort of bright-line rule with respect to temporal proximity. But what it has said is that, generally speaking, a time gap of more than two or three months without additional evidence of causation or without, you know, unusual circumstances like an impossibility to retaliate at an earlier point in time. But the whole theory of the case is retaliating her through the scheduling complex. That's the theory of the case. And if she complained, you say in January? January 2017, February 2017. Then the chance would have been the next semester. There wasn't another chance to retaliate with the scheduling. You couldn't do it in two months because there was not another semester in two months. That's my point. So just to clarify the record, the next scheduling conflict that arose was August 2017. That's approximately eight months later. But there has been no showing here that it was, you know, impossible to retaliate earlier. And I'll note that, you know, she was a full-time employee. They retaliated her through scheduling conflict, so she couldn't comply with the settlement agreement. The next available time was eight months later. That's my point. But, again, this goes back to our conversation earlier. There is no evidence in the record. The college went out of its way to accommodate her scheduling issues at every point in time. Dr. Robotham— I know that's been getting to their—that's stage three, right? I understand that, but you don't consider that stage one. In the prior phase of your case, you don't consider the employee's explanations. You consider that at the final stage, right? Plaintiff has made—there are cases where this Court has recognized that, you know, has looked at a temporal proximity beyond this sort of three-month benchmark to include seven or eight months. I don't want to spend too much time on it. I'm wasting your time. But he suggested that there were other people involved in the scheduling. Can you just address that? Was it the dean? Can you address that issue? Certainly. And that's simply not true. It is undisputed in this case that Professor Robotham had the sole responsibility for her scheduling activities. That's—Brown herself acknowledged this in her deposition testimony. That's at pages 210 and 212. Also, President Crew confirmed in his sworn declaration that department chairs have the sole responsibility for scheduling. That's at page 285 of the record. And I will add here that there is no evidence that either Dr. Robotham or President Crew had any knowledge whatsoever of her complaints. Robotham and Crew did not receive the complaints that are at issue here. President Crew provided uncontroverted testimony that he was unaware of Brown's complaints when he rendered the tenure decision. The few college administrators who did have knowledge of those complaints testified that they never spoke to Crew about those complaints. And Brown points to no other evidence suggesting that they learned of those complaints through other channels. Mr. Carlin mentioned several times that she still received a well-qualified rating. Correct. Can you address that? Why that shouldn't be considered? Yes, certainly. So, it's true that the two PMV committees did say that they approved her tenure. But how the process works at CUNY is it then goes to the president for his own independent assessment of the candidate's suitability for tenure. He has an independent responsibility to make sure that that person is qualified. And here, President Crew determined that she did not meet the standards set out in that January 2017 settlement agreement. And Brown does not dispute that here. I'll also note that this is a highly unusual case. President Crew did testify that he normally, in a normal case, he does follow the recommendations of the PMV committees. But this is not a usual case. This is an individual who was denied tenure the first time around after being found guilty of serious academic misconduct. They were then given a second chance to reapply for tenure and then failed to meet the standards set out in that January 2017 settlement agreement. I am not aware of any comparator person who's been in a similar situation here. Brown has not pointed to any comparator here as well. Can you help me? I'm wondering if the district court judge created a misstatement with our law and whether or not it matters. I'm looking at the opinion when they're trying to explain the prima facie case. The burden shifts back to the plaintiff to present evidence of the employer's proffered reason as a pretext for an impermissible motivation. If the plaintiff cannot establish pretext, the employer is entitled to summary judgment. I understood our law to say that pretext is one way, one in which one can show an impermissible motive, but one does not have to actually show pretext. Do you understand our circuit precedent to be different? As I understand it, the ultimate burden at that stage is that the plaintiff has to show that retaliation was a but-for cause for the adverse employment action. One way, perhaps, of shifting the burden back to the employer is to show pretext. But the only burden is to show that the adverse action was created with improper motive. Correct. Not necessarily pretext. That's correct. And to answer your second part of your question, that absolutely doesn't provide any cause for concern here because there was no evidence to show that retaliation was a but-for cause here. There was certainly no showing of pretext, as we just discussed, but there also was no showing. And this Court has made very clear that even if this Court were to find that temporal proximity is met and we maintain that it was not here, that that is not sufficient at that stage of the Title VII framework. So what if we disagree with you? And I'm picking up on something that Judge Bianco mentioned earlier. What if we disagree with you and the district court that the prima facie case was at least made? Do you still think that you have enough in the record to be given summary judgment? Yes, absolutely, because CUNY came forward with a legitimate non-retaliatory rationale for that tenure decision, which was the ultimate retaliation that was alleged here. And there's been no showing of, again, pretext or any sort of counter showing of that but-for causation here. But I do want to push back on the idea that the prima facie case has been shown. Here, again, in cases like the Trivedi case, this Court has looked at temporal proximity in conjunction with the plaintiff's other causation evidence and the causation evidence in the record. In that case, for example, the Court assumed that temporal proximity had been shown, but the actors, the relevant actors who took the adverse employment action in that case, they did not have the requisite knowledge of the complaints. The Court found that the plaintiff had not met their burden at that prima facie case. That is exactly the situation here, except the evidence is even stronger against Ms. Brown, because not only is there no knowledge on the part of the actors, they also supported Ms. Brown, and the College went out of its way to accommodate her at every single juncture. All right, thank you. Thank you. Mr. Carlin, you have three minutes for a vote. I'd just like to make two points. One, since the causation, there was a meeting in September of 2018 with the provost. In that meeting, my client raised the issue of, obviously, the scheduling conflicts that she had, as well as the workload. She felt at that point that she was prevented from attending that, and she raised the issue of discrimination. That was in September of 2018. He, the provost, participated in discussions while the decision was being made in December of 2018, which would make it three months. In the Herrera case, which is actually a case that I had handled, it was a school case where this court has to take notice of the fact that it's a school. So you have blocks of time when, for instance, summer months, and you have blocks of time where you cannot act. And in the Herrera case, it was over actually a two-year period of time where there were actual claims of retaliation, which the court acknowledged, because it was a school case, and they just had the opportunity. They didn't really have the opportunity to retaliate until then. So I would respectfully submit that in this particular case, because of the extensive, and I mean extensive, EEO activity of my client, touching almost all of the players in this case, that there was substantial protective activity and causation that has been met. There's also the issue of credibility here. Cruz said that he acknowledged there was some issues with scheduling, but he denied that he ever received a complaint of discrimination. And my client had emailed him directly regarding the complaint of discrimination. So there's issues with respect to his own credibility. And then finally, I want to conclude, besides the fact that the state, the college-wide committee gave her basically almost the highest rating possible, I had asked both Cruz and the provost, do you recall ever overruling the committee? No. We got statistics from three years back, and we're talking about literally, you know, 24, 25. I don't have the exact number. Nobody had been denied tenure that was recommended. All right. Thank you. Thank you all for a reserved decision. Have a good day. All right. Thanks.